J-S31027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.C.A. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.N.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1185 EDA 2025 |

Appeal from the Decree Entered April 2, 2025
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2024-A0117

| | | |
|---|---|---|
| IN RE: ADOPTION OF E.J. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.N.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1186 EDA 2025 |

Appeal from the Decree Entered April 1, 2025
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2024-A0118

BEFORE: PANELLA, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY DUBOW, J.: **FILED DECEMBER 9, 2025**

Appellant, L.N.J. ("Mother"), appeals from the April 1, 2025 decrees entered in the Montgomery County Court of Common Pleas that terminated her parental rights to fifteen-year-old T.C.A. ("Child 1") and ten-year-old E.J

("Child 2") (collectively, "Children")[1]  Mother's counsel, Michael E. Kelley, Esq., has filed a petition to withdraw as counsel and an ***Anders***[2] brief, to which Mother has not filed a response.  Upon review, we grant counsel's petition to withdraw and affirm.

The following factual and procedural history is relevant to this appeal. The Montgomery County Office of Children and Youth ("the Agency") has been involved with the family since 2018.  Most recently, in September of 2021, the Agency received a referral regarding deplorable conditions in Mother's home, where she lived with her bed-ridden mother, her father, her boyfriend, and Children.  On September 15, 2021, the Agency implemented a safety plan and placed Children with Mother's cousin.  On September 19, 2021, police arrested Mother and charged her with Simple Assault and Harassment for biting her cousin on the chin necessitating 15 stiches.  In November of 2021, Mother's cousin informed the Agency that she could no longer be a safety plan resource, and the Agency obtained emergency custody of Children due to the conditions in Mother's home.  Specifically, the home was "very dirty," had a roach and fly infestation, a broken bathroom, a large amount of trash, sticky floors and surfaces, broken kitchen counters, numerous pets and fecal matter in the home, and a "horrible smell[.]"  N.T. Hearing, 2/18/25, at 16.  The court

_____

[1] On April 1, 2025, the trial court also entered decrees approving the voluntary relinquishment of parental rights of Child 1's father and involuntarily terminating the parental rights of Child 2's unknown birth father.  Neither father is a party to this appeal.

[2] ***Anders v. California***, 386 U.S. 738 (1967).

ordered the Agency to return Children to Mother's care a few days later and implement services within the home, including in-home services through the Lincoln Center to assist Mother with cleaning; Mother was uncooperative.

Approximately eight months later, in July of 2022, the Agency once again obtained emergency custody of children due to unsanitary and unsafe conditions in Mother's home. The court adjudicated Children dependent on August 3, 2022, returned Children to Mother's care, and ordered Mother to comply with services in the home. The Agency implemented in-home services through JusticeWorks, an agency tasked with helping Mother clean, repair, and organize the home. Mother failed to comply with services and the conditions within the home did not improve. During this time, Mother was combative with the Agency caseworker during home visits. The Agency caseworker witnessed Mother persistently screaming at Children and observed that Children appeared "stressed" and "intimidated" in the home. *Id.* at 26. Mother also told the caseworker that she was attending therapy but refused to sign any releases permitting the caseworker to confirm Mother's diagnoses or attendance at programs or therapy.

On November 2, 2022, the Agency once again obtained emergency custody of Children and placed them in foster care with Laurie Bownam ("Foster Mother"), where they remain. The court ordered Mother to: cooperate with in-home providers to routinely clean the home; complete her Family Service Plan objectives; sign releases for mental health providers; comply with mental health treatment and provide verification of it; and obtain

a drug and alcohol evaluation and sign releases for any recommended treatment.

At the end of 2022, Child 1 was diagnosed with diabetes. The Agency would not allow Child to have unsupervised visits with Mother until Mother completed the educational program at Children's Hospital of Philadelphia ("CHOP"), where Child 1 was being treated. Mother attended one session but failed to complete the program.

In August of 2023, Mother's mother passed away and Mother became homeless. Resources for Human Development attempted to assist Mother with a search for housing. Mother initially maintained contact with the Agency but, over the course of a few months, Mother stopped contacting the Agency. The Agency caseworker did not have contact with Mother from September 2023 until February 2024. Mother reported having a few different jobs in 2023 and early 2024, including working at the Dollar Store, at Eagleville Hospital, and as a home health aide.

When Children first entered foster care in 2022, Mother had weekly overnight visits with Children which eventually decreased to bi-weekly supervised daytime visits. Mother has not been consistently visiting with Children since September 2023. During an April 2023 visit at a doctor's office, Mother and Child 1 had a physical altercation where Mother lunged across the table, pulled Child 1's hair, and tried to choke Child 1. During an August 2023 visit at the Agency, Mother engaged in a verbal altercation with Child 1. After these confrontations, Child 1 refused to attend visits with Mother. Child 2

continued to visit with Mother, but Mother only attended three visits with Child 2 during 2024. Mother has not had any visits with Children since June of 2024.

On July 29, 2024, the Agency filed petitions to terminate Mother's parental rights to Children. The trial court appointed Robert Angst, Esq., to serve as Children's legal counsel and guardian *ad litem* after finding that there was no conflict in Attorney Angst serving in the dual role.

On October 16, 2024, Mother participated in a parenting capacity evaluation conducted by Jessica A. Port, Psy.D. Dr. Port noted that Mother was diagnosed with Bipolar I Disorder. Dr. Port concluded to a reasonable degree of professional certainty: "it is **not** felt that [Mother] is yet able to independently meet her children's social, emotional, and behavioral needs until she addresses her mental health and improves her parenting skills." Assessment, 10/31/24, at 13 (emphasis in original). Dr. Port recommended that Mother participate in a psychiatric consultation; participate in a parenting class; engage in cognitive behavioral therapy; cooperate with Case Management and CareerLink services to help with housing, jobs, transportation; and participate in prosocial activities in areas of interest to support emotional stability and mental health.

The trial court held hearings on the Agency's termination petitions on February 18, 2025, and February 27, 2025. The Agency called the following witnesses: Michelle Terry, Agency caseworker; Carol Robinson, Agency caseworker; Dr. Port; and Foster Mother. Mother testified on her own behalf

and called Heather Rovner, Resources for Human Development caseworker, as a witness.

The Agency witnesses testified in accordance with the above-stated facts. Additionally, Ms. Terry testified that she observed a "deteriorating" relationship between Mother and Children. N.T. Hearing, 2/18/25, at 39, 47. Ms. Robinson testified that Children are doing well in Foster Mother's home where they have structure and stability. She testified that Children both have special needs, since living in the foster home Child 1 is diagnosed with diabetes and Child 2 has been diagnosed with autism, oppositional defiant disorder, and attention deficit hyperactivity disorder. Ms. Robinson explained that Foster Mother is meeting all of Children's needs, including Child 1's medical needs and Child 2's educational needs. Ms. Robinson testified that Foster Mother is the educational decision maker for Children and facilitated Child 2 being evaluated for autism and receiving extra support in school. She testified that Children "look to [Foster Mother] for security." *Id.* at 102. Ms. Robinson testified that she believed it was in Children's best interest to be adopted and that Child 1, who is 15 years old, has expressed her consent to adoption.

Foster Mother testified that she has been a foster parent for over 35 years, has had 54 foster children in her home, and has adopted three of them. She testified that she has six children in total. Foster Mother explained that her twenty-four-year-old daughter and her seven-year-old son live in her home with Children. Foster Mother testified that Children are loved and are a

part of her family, and part of her extended family. She testified that they have close relationships with her older children who do not live in the home, as well as her brother. She explained that she wants to adopt the Children, that she has talked to her entire family and Children, and "we were all on the same page" about the adoption. *Id.* at 38.

Mother testified and acknowledged her past struggles with unstable housing, lack of employment, and mental health. Mother admitted that she was not currently employed. Mother explained that after her mother's death on July 5, 2023, she became homeless and was occasionally living in a tent in Norristown. Mother confirmed that she was currently homeless. Mother denied having a physical altercation with Child 1 during a visit but admitted that she raised her voice. Mother testified that she has not had a visit with Children since June 2024 due to "lack of communication and me unable to get back and forth." N.T. Hearing, 2/27/25, at 150. Mother testified that she attempted to contact the Agency caseworker "here and there." *Id.* at 152. Mother stated that, in the past, she has been diagnosed with bipolar disorder and schizophrenia. Mother testified that she was currently receiving treatment at Central Behavioral Health ("CBH") but was not currently taking the medication that CBH prescribed her. Mother confirmed that she did not provide any documentation about her attendance at CBH to the Agency. She stated, "I can get the records, yes. I have the records" and testified that there was no reason she did not provide the records to the Agency. Mother testified that she completed the diabetes training at CHOP but was unable to provide

the documentation to the Agency. Mother expressed that she did not want her parental rights to be terminated. Mother testified, "Give me a chance. Just give me a chance. At the end of the day, those are my babies. I can care for them. I just need time. I don't have it right now. I love my children with all of my heart." *Id.* at 144-145.

On April 1, 2025, the trial court terminated Mother's parental rights to Children. Mother timely appealed. Both Mother and the trial court complied with Pa.R.A.P. 1925.

On August 15, 2024, Attorney Kelley filed an *Anders* brief indicating that, upon review, Mother's appeal is wholly frivolous. Mother failed to respond.

In the *Anders* brief, counsel indicated that Mother wished to raise the following issues for our review:

1. Whether Mother's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1) due to "conduct continuing for a period filing of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties[?]"

2. Whether Mother's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(2) due to "repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for her physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent[?]"

3. Whether Mother's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(8) by finding "twelve months or more have elapsed from the date of removal or placement;

- 8 -

the conditions which led to the removal or placement of the child continue to exist; and termination of parental rights would best serve the needs and welfare of the child[?]"

4. Will "the developmental, physical and emotional needs and welfare of [Children] [be] best served by the termination of birth mother's parental rights[?]"

**Anders** Br. at 4-5.

* * *

As a preliminary matter, we address appellate counsel's request to withdraw as counsel. "When presented with an **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw." **Commonwealth v. Daniels**, 999 A.2d 590, 593 (Pa. Super. 2010). In order for counsel to withdraw from an appeal pursuant to **Anders**, our Supreme Court has determined that counsel must meet the following requirements:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Commonwealth v. Santiago**, 978 A.2d 349, 361 (Pa. 2009).

Counsel has complied with the mandated procedure for withdrawing as counsel. Additionally, counsel confirms that counsel sent Mother a copy of the **Anders** brief and petition to withdraw, as well as a letter explaining to Mother

that she has the right to retain new counsel, proceed *pro se*, and to raise any additional points. *See Commonwealth v. Millisock*, 873 A.2d 748, 751 (Pa. Super. 2005) (describing notice requirements).

Because counsel has satisfied the above requirements, we will address the substantive issues raised in the *Anders* brief. Subsequently, we must "make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous." *Santiago*, 978 A.2d at 355 n.5 (citation omitted); *see also Commonwealth v. Yorgey*, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*) (noting *Anders* requires the reviewing court to "review 'the case' as presented in the entire record with consideration first of issues raised by counsel").

* * *

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276

- 10 -

(Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *L.A.K.*, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 592 (citations and internal quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "[I]nitially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). As discussed above, "[t]he

party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). We concentrate our analysis on Section 2511(a)(1).

Section 2511(a)(1) provides that the trial court may terminate parental rights if the petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). "The focus of involuntary termination proceedings is on the conduct of the parent[]" and whether that conduct justifies termination of parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the

whole history of a given case and may consider a parent's inaction before the six-month statutory provision. **K.Z.S.**, 946 A.2d at 758.

Our Supreme Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert [herself] to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

**L.A.K.**, 265 A.3d at 592 (internal citations and quotation marks omitted).

It is well-settled that "a parent's efforts are always considered in light of existing circumstances." **Id.** (citations and internal quotation marks omitted). "To that end, even where the evidence clearly establishes [that] a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." **Id.** at 593 (citations and internal quotation marks omitted).

Our Supreme Court has explained:

> Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). . . . It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case.

*Id.* Notably, "a parent's efforts to enforce his or her legal custody rights unquestionably establishes the affirmative performance of a positive parental duty[.]" *Id.* at 594. Finally, "with respect to any petition filed pursuant to subsection (a)(1) . . . the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

Instantly, the trial court found that Mother failed to perform parental duties for Children for more than six months preceding the filing of the termination petitions and that, despite the challenges posed by her homelessness, Mother failed to provide a viable explanation for her lack of contact with Children. The court opined:

> In this case, the [c]ourt hereby determines that [the Agency] has established by clear and convincing evidence that the parent has failed to perform any parental duties for a period of more than 6 months prior to the filing of the Petition for Termination of parental rights. This [c]ourt must now consider the parent's explanation for his or her conduct and the post-abandonment contact with the children. In this case, although [Mother] appears to be sincere in her love for the children and her desire to resume custody of them,

- 14 -

she provided virtually no explanation for why she has not made it her priority to continue to visit the children and to connect with them and provide them with emotional support. She also provided no adequate explanation for whether she is receiving treatment for her mental health issues and achieving her goal of managing her own emotional well-being and regulation so that she may interact with the children in a healthy way. Her struggle with homelessness is serious and appears to have disrupted, to some degree, her ability to maintain her documentation, a phone number, and contact with her [Agency] caseworkers. However, she has not demonstrated that she has used the tools available to her to maintain contact with [the Agency] and to maintain visits with the children.

Trial Ct. Op. at 17-18.

Based on our review, we conclude the court properly exercised its discretion in terminating Mother's parental rights pursuant to Section 2511(a)(1). The court heard undisputed testimony that Mother has not had contact with Children since June of 2024. The record supports the trial court's findings that Mother failed to provide essential parental care for Children. Thus, we discern no abuse of discretion.

* * *

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent "does not preclude the termination of parental rights." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

Instantly, the trial court found that termination of Mother's parental rights was in Children's best interest and "will not irreparably harm [Children]." Trial Ct. Op. at 21. The trial court found that, although Mother loves Children, she had "not maintained sufficient and consistent contact and there is no longer a healthy parental bond between" Children and Mother. *Id.* at 20. The trial court further found that Mother's "desire to start over at this time is insufficient to meet [Children]'s needs for consistent and reliable love, affection, and responsibility." *Id.* Finally, the trial court found "that a secure

and strong bond has developed between [F]oster [M]other and [Children]."

*Id.*

The record supports the trial court's findings. The trial court credited testimony from the Agency caseworkers that Children have a secure bond with Foster Mother, that their relationship with Mother is deteriorating due to the lack of contact, and that termination of parental rights would be in Children's best interest. Accordingly, we discern no abuse of discretion.

In sum, following our review of the issues raised in counsel's ***Anders*** brief, we agree with counsel that the trial court did not abuse its discretion in terminating Mother's parental rights. In addition, our independent review of the proceedings reveals there are no issues of arguable merit to be raised on appeal. Accordingly, we grant counsel's petition to withdraw and affirm the order terminating Mother's parental rights.

Order affirmed. Petition to withdraw as counsel granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/9/2025